UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED: April 27, 2020

RICHARD HARBUS,

                    Plaintiff,

          – against –

MANHATTAN INSTITUTE FOR POLICY
RESEARCH, INC.,

                    Defendant.

**OPINION AND ORDER**

19 Civ. 6124 (ER)

Ramos, D.J.:

Richard Harbus ("Harbus"), brings this action against Manhattan Institute for Policy Research, Inc. (the "Manhattan Institute") under the Copyright Act, 17 U.S.C. § 101, alleging that the Manhattan Institute infringed on his copyright in a photograph of New York Governor Cuomo speaking in front of the old and new Tappan Zee bridges. The Manhattan Institute moves to dismiss the action on the basis that their use of the photograph was protected "fair use" under the Copyright Act. *See* 17 U.S.C. § 107. For the reasons set forth below, the motion to dismiss is GRANTED.

## I.    BACKGROUND[1]

Harbus is a professional photographer in the business of licensing his photographs to online and print media for a fee. Am. Compl., Doc. 12 ¶ 5. He owns the copyright in a photograph of New York Governor Andrew Cuomo holding a microphone and speaking in front of the old and new Tappan Zee bridges (the "Photograph"):

---

[1] The following facts are largely drawn from the amended complaint, Doc. 12. Some of the facts are drawn from the Court's own review of the Manhattan Institute's website, which has been incorporated by reference into, and is integral to, Harbus' first amended complaint. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (Chin. J.) (drawing facts from "Court's own review of the website" on a motion to dismiss because the website was incorporated by reference into the complaint); *see also Gorran v. Atkins Nutritionals, Inc.*, 464 F.Supp. 2d 315 319 n.1 (S.D.N.Y. 2006) (same).



*Id.* ¶¶ 7-8; *Id.* Ex. A.

On September 5, 2018, the New York Post published an article titled "*The new Tappan Zee shows the best—and the Worst—of Cuomo*" (the "Article").  *Id.* ¶ 8; *Id.* Ex. B.  The Article featured the Photograph, which the New York Post licensed from Harbus for a fee.  *Id.* ¶ 8.  As the Article noted, its author, E.J. McMahon, is a "Manhattan Institute adjunct fellow."  *Id.* Ex. B at 2.

The Manhattan Institute is a non-profit think tank whose mission is "to develop and disseminate new ideas that foster greater economic choice and individual responsibility."  On September 7, 2018, the Manhattan Institute posted the Article on its website (the "Website").  *Id.* ¶¶ 6, 11; *Id.* Ex. C.  The Manhattan Institute posted the Article in the "Publications: Commentary" section of its Website, along with thousands of articles written by its fellows that have been published by the Wall Street Journal, the New York Daily News, USA Today and

other prominent news media.  The Manhattan Institute posted the Article as it was published by

the New York Post.  However, the Photograph was not shown in its entirety, but rather was

cropped and darkened as follows:



Am. Compl. Ex. C at 2.  As displayed on the Website, the Photograph is cropped such that one

can only see two hands holding a microphone and the outline of a man's chest.  *Id.*  In addition,

the portion of the Photograph displayed is further obscured by overlaid text such as the Article's

title, the author's name, the date of publication, the publishing news outlet, and the subject

matter of the Article.  *Id.*

　　　　To the right of the text, the Manhattan Institute included links allowing viewers to print

the Article or to share it on Facebook.  *See id.*  Harbus' counsel has attached to the first amended

complaint a screenshot of his own attempt to share the Article through his Facebook account, as

follows:



*See id.* Ex. C at 1.

Harbus commenced the instant action on June 30, 2019.  Doc. 1.  The Manhattan Institute

answered on August 5, 2019.  Doc. 9.  On September 10, 2019, Harbus filed the first amended

complaint.[2]  Doc. 12.  On November 15, 2019, the Manhattan Institute moved to dismiss the first

amended complaint on the basis that its use of the Photograph is protected fair use.  Doc. 19.

## II.     MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

facially plausible "when the plaintiff pleads factual content that allows the court to draw the

---

[2] In the original complaint, Harbus asserted a claim for both copyright infringement under the Copyright Act, and a claim for removal and/or alteration of copyright management information under the Digital Millennium Copyright Act.  Doc. 1.  In the first amended complaint, however, Harbus asserts only a single claim for copyright infringement under the Copyright Act.  Doc. 12.

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citations omitted).

### III.    DISCUSSION

Harbus brought this action under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*  The purpose of the copyright law is "[t]o promote the Progress of Science and useful Arts . . . ."  U.S. Const., Art. I, § 8, cl. 8.  "[T]he copyright is not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public."  Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990) ("Leval"); *see Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 618 (2013).  The Copyright Act furthers this purpose by granting authors a limited monopoly over the dissemination of their original works of authorship.  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).  In particular, the Copyright Act confers upon authors certain enumerated exclusive rights over their works during the term of the copyright, including the rights to reproduce the copyrighted work and to distribute those copies to the public.  *Id.* (citing 17 U.S.C. § 106(1), (3)).

At the same time, there are important limits to an author's rights to control original and derivative works.  *Id.* at 95.  "One such limit is the doctrine of 'fair use,' which allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances."  *Id.*  The fair use doctrine mediates between the "property rights [copyright law] establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others, which must be protected up to a point."  *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006).

The fair use doctrine was first codified in the Copyright Act of 1976, which lists four non-exclusive factors that must be considered in determining fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Although fair use is an affirmative defense, it "may be adjudicated" on a motion to dismiss "where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  While defendant bears the burden of proving that its use was fair, it need not establish that each of the factors set forth in § 107 weighs in its favor. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476-77 (2d Cir. 2004), *cert. denied*, 543 U.S. 1000 (2004)).  Instead, the factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).[3] Moreover, as will be seen below, certain considerations will be relevant with respect to more than one factor.  Contrary to Harbus' assertion, courts in this district have granted motions to dismiss on fair use grounds when all that is necessary for the Court to make a determination as to fair use are "the two works at issue." *See, e.g.*, *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537,

---

[3] As the Supreme Court stated in *Campbell*, the fair use inquiry may be guided by the examples set forth in the preamble to Section 107, such as whether the purpose of the use was for "criticism, comment, news reporting, teaching . . . , scholarship, or research."  510 U.S. at 578-79; *see* 17 U.S.C. § 107.

548 (S.D.N.Y. 2019); *see also Clark v. Transp. Alts., Inc.*, No. 18 Civ. 9985 (VM), 2019 WL
1448448 (S.D.N.Y. Mar. 18, 2019).[4]

### A.  Factor One:  The Purpose and Character of the Use.

The first factor, which addresses the manner in which the copied work is used, is the
"heart of the fair use inquiry."  *Blanch*, 467 F.3d at 251.  As the Supreme Court instructed in
*Campbell*, the central purpose of the inquiry is to see whether the new work merely supersedes
the objects of the original creation, or instead adds something new, with a further purpose of
different character, altering the first with new expression, meaning, or message.  510 U.S. at 579
(quoting *Folsom v. Marsh*, 9 F.Cas., 342, 348 (no. 4,901) (C.C.D. Mass. 1841)).  In other words,
the investigation "asks . . . whether and to what extent the new work is 'transformative.'"  *Id.*
(quoting Leval at 1111).  "A use is transformative if it does something more than repackage or
republish the original copyrighted work."  *HathiTrust*, 755 F.3d at 96.

The Manhattan Institute contends that the first factor favors a finding of fair use because:
(1) the Manhattan Institute and Harbus used the Photograph for different purposes; (2) its use of
the Photograph furthers research, teaching and scholarship purposes; and (3) it used the
Photograph for a noncommercial purpose.  The Court agrees.

### 1)  *Transformative Use*

Here, Harbus and the Manhattan Institute used the Photograph for different purposes.  By
Harbus' own account, he created the Photograph to show what Governor Cuomo looked like
delivering a speech in front of the Tappan Zee bridges.  Mem. of Law in Opp'n ("Harbus'
Mem."), Doc. 24 at 9; Am. Compl. ¶ 8.  The Manhattan Institute, on the other hand, did not use

---

[4] The Court notes that these two cases, along with several other cases cited by the Manhattan Institute in its reply
brief that were similarly dismissed on fair use grounds at the pleading stage, were also brought by Richard
Liebowitz, Harbus's legal counsel in the instant action.  *See* Doc. 27 at 1.

the Photograph to that end.  Indeed, neither Governor Cuomo's face nor the Tappan Zee bridges are even visible in the portion of the Photograph displayed on the Website.  Furthermore, the Photograph and the Article were placed in the "Publications: Commentary" section of its Website, along with thousands of articles written by the Manhattan Institute's fellows published in various prominent news outlets.  It is thus readily apparent that the Manhattan Institute displayed the Photograph along with the Article to educate the public about its work, and to document the Article's publication in the New York Post.  The fact that the Manhattan Institute displayed the Photograph in this new context and to serve a different purpose than Harbus' original purpose, weighs in favor of a finding of fair use.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (finding fair use where defendant used images "in a new context to serve a different purpose"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (finding the first factor favored fair use where defendant's purpose in using the copyright images at issue is plainly different from their original expressive purpose).

This conclusion is further bolstered by the fact that the Manhattan Institute's use of the Photograph furthers its research, scholarship and educational efforts.  Under 17 U.S.C. § 107, Congress identified several statutory examples of permissible uses, including "news reporting . . . teaching, scholarship, and research."  As detailed on the Website, the Manhattan Institute engages in significant policy research and makes its works, including the Article at issue in this case, freely available to public viewers, in furtherance of its mission "to develop and disseminate new ideas that foster greater economic choice and individual responsibility."

Harbus' contention that the Manhattan Institute's use was not transformative because it simply reposted the Article along with the Photograph with no added commentary does not counsel a different result.  The Second Circuit Court of Appeals has instructed that the law

9

"imposes no requirement that a work comment on the original" in order to be deemed transformative.  *See Cariou*, 714 F.3d at 706 (internal citations omitted).  Additionally, given that the very purpose the Manhattan Institute made the Article available was to educate the public about its work and to document its publication by the New York Post, there was no reason for the Manhattan Institute to include additional commentary.  *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (finding that a secondary work can be transformative in function or purpose without "altering or actually adding to the original work").  Indeed, the Second Circuit recognized that in some instances, the "need to convey information to the public accurately" makes it preferable and compatible with copyright law for a defendant to "faithfully reproduce an original work without alteration."  *Id*. (internal citations omitted).  That is the case here.

Harbus' remaining contention that no transformation exists where the Manhattan Institute merely used the Photograph to illustrate a news story about the subject matter depicted in the Photograph fares no better.  The Manhattan Institute did not publish an independent news story, which its adjunct fellow just had just done, nor did it publish the Photograph in a media publication.  Instead, the Manhattan Institute displayed the Photograph in the library section of the Website that houses all of the works published by its fellows in major news outlets.  As such, Harbus' citation to various cases involving for-profit news or media agencies that used copyrighted photographs to illustrate their own articles about the subject matter of the photographs[5], is of little relevance to the facts here.

---

[5] *See e.g., Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 534 (S.D.N.Y. 2018) (defendant used copyrighted image "solely to present the content of that image"); *see also Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (defendant used copyrighted images as "illustrative aids because they depicted the subjects described in the articles").

*2)  Commercial Use*

Next, as part of the first factor, the Court must also consider whether, and to what extent, defendant's use was for a commercial purpose.  As the Supreme Court clarified in *Harper & Row*, the essence of the inquiry here is not whether the "sole motive of the use is monetary gain," but rather whether the defendant stands to "profit from exploitation of the copyrighted material." 471 U.S. at 562 (internal citations omitted).

Here, this factor weighs decidedly in favor of a finding of fair use.  The Manhattan Institute is a qualified 501(c)(3) non-profit organization.  Although the Manhattan Institute engages in general fundraising and sells books on the Website, nothing in the record indicates that it used the Photograph to solicit donations or to promote sales of those books.  *See Blanch*, 467 F.3d at 253 (stating that the commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work).  Accordingly, the non-commercial nature of the Manhattan Institute's use of the Photograph favors a finding of fair use.  *See Clark*, 2019 WL 1448448, at * 4 (finding that first factor favors fair use where defendant used photograph for "non-commercial purposes—an opinion post on a non-profit organization's blog").

*3)  Bad Faith*

Because fair use is an affirmative defense, it is the defendant's burden to show that it did not act in bad faith.  On a motion to dismiss on the basis of fair use, absence of bad faith must therefore be evident on the face of the pleadings.  Here, Harbus has not alleged that the Manhattan Institute engaged in any wrongdoing other than its use of the Photograph without his permission.  *See Campbell*, 510 U.S. at 585 n. 18 (stating if a use is otherwise fair, then no

permission need be sought or granted).  Recognizing the lack of factual allegations of bad faith, Harbus nevertheless contends that more discovery is needed to determine if the Manhattan Institute consulted with counsel about copyright law and the fair use defense prior to its use of the Photograph.  However, as another court within this district recently held, a defendant's alleged failure to consult counsel alone is not indicative of bad faith.  *See Otto v. Hearst Commc'ns Inc.*, 345 F. Supp. 3d 412, 429 n.3 (S.D.N.Y. 2018).  In any event, the Second Circuit has instructed that the bad faith of a defendant generally contributes little to fair use analysis, and is not dispositive of a fair use defense, or even the first factor.  *See NXIVM Corp.*, 364 F.3d 471, 479 n. 2 (citing *Campbell*, 510 U.S. at 585 n.18.).  Accordingly, the Court finds that the bad faith subfactor does not counsel against a finding of fair use.

### B.  Factor Two: The Nature of the Work

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 286.  Courts have generally adopted two types of distinctions in their analysis of the second factor:  (1) whether the work is express or creative, such as a work of fiction, or more factual with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.  *Blanch*, 467 F.3d at 257 (quoting 2 Howard B. Abrams, *The Law of Copyright*, §  15:52 (2006)); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985) ("The unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use.").  In the end, however, this factor is rarely found to be determinative.  *Arrow Prods., LTD. v. Weinstein Co.*, 44 F. Supp. 3d 359, 371

(S.D.N.Y. 2014) (citing *Davis*, 246 F.3d at 175).

The Court finds that the second factor favors a finding of fair use. Here, the Photograph is a factual and informational, as opposed to creative, work that Harbus plainly acknowledged was taken to "show what Governor Cuomo looked like delivering a speech" and thus to document Governor Cuomo at a public event. Harbus' Mem. at 9. Also weighing in the Manhattan Institute's favor is the fact that the Photograph has been published by the New York Post.

Harbus' only contention to the contrary, that the Photograph was creative because it was created by a professional photographer, is unpersuasive. *Id.* at 14. Courts analyzing similar photographic works created for news gathering or other non-artistic purposes have found this factor to weigh in favor of fair use. In *Katz v. Chevaldina*, No. 12 Civ. 22211, 2014 WL 2815496, at *1 (S.D. Fla. June 17, 2014), *adopted by*, 2014 WL 4385690 (S.D. Fla. Sept. 5, 2014), the court considered the defendant's publication of a critical blog post which incorporated a copyrighted photograph of the plaintiff. The court concluded that the second factor weighed in the defendant's favor because the photograph captured the plaintiff in a public setting and was simply used to identify him, and there was "no evidence that the photographer influenced, *at all*, the Plaintiff's activity, pose, expression or clothing." *Id.* at *8 (emphasis added). The court went on to note that it could not be said that the photograph conveyed the photographer's ideas or emotions. *Id.*; *see also Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007) (finding that the second factor weighed in favor of fair use because the plaintiff did not employ a creative process in photographing alleged mobster after arrest). Here, there can be no dispute that Harbus exercised "no more than the minimum authorial decision-making as to the primary elements of the Photograph," *id.*, and that the Photograph is a quintessential example of

13

photojournalism.  While the Court does not doubt that in some instances, photographs of actual people, places and events may well be sufficiently creative and deserving of protection, the Photograph at issue here is more properly characterized as a factual and informational work as opposed to a product of a creative process.

Accordingly, because the Photograph is factual and has been previously published, this factor favors a finding of fair use.  However, as mentioned above and as both parties agree, this factor is rarely determinative.

### C.  Factor Three:  The Amount and Substantiality of the Portion Used

The third factor bearing on fair use is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  The question is whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying. *Campbell*, 510 U.S. at 586 (quoting *Folsom*, 9 F. Cas. At 348); *see also HathiTrust*, 755 F.3d at 98 (stating that the third factor asks whether the copying used more of the copyrighted work than necessary and whether the copying was excessive).  "In general, 'the more of a copyrighted work that is taken, the less likely the use is to be fair.'"  *Swatch*, 756 F.3d at 89 (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998)).  As the Second Circuit has noted, however, there are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use.  *HathiTrust*, 755 F.3d at 98 (quoting *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986)).  "[T]he extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87.  Indeed, for some purposes, it may be necessary to copy the entire copyrighted work, and the third factor would not weigh against a finding of fair use in such circumstances.  *HathiTrust*, 755 F.3d at 98; *see, e.g., Bill Graham Archives*, 448 F.3d at 613.  "The crux of the inquiry is whether 'no more was taken

14

than necessary.'" *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589).

Given the manner in which the Manhattan Institute displayed the Photograph, the Court concludes this factor also weighs in favor of a finding of fair use.  Contrary to Harbus' assertion, the Manhattan Institute did not engage in wholesale reproduction of the Photograph.  Instead, a darkened and cropped portion of the Photograph is displayed on the Website.  The portion of the Photograph displayed is further obscured by overlaid text such as the Article's title, the author's name, the date of publication, and the subject matter of the Article.  Am. Compl. Ex. C at 2.  As a result of the substantial cropping and overlaid text, neither Governor Cuomo's face nor the Tappan Zee bridges are visible in the portion of the Photograph displayed on the Website.  Indeed, as the Manhattan Institute correctly points out, the only things arguably visible from the Photograph are two hands holding a microphone and the outline of a man's chest—and even those are obscured by the text and appear in a darkened tone.  Accordingly, because the Manhattan Institute only displayed a significantly cropped and darkened version of the Photograph on its Website, the third factor favors fair use.  *See Yang*, 405 F. Supp. 3d at 547 (third factor favored defendant because it used "a significantly cropped version of the [p]hotograph").

Harbus makes no arguments directed at Manhattan Institute's display of the Photograph on the Website, but contends instead that the Manhattan Institute engaged in wholesale reproduction of the Photograph on its Facebook page, citing as support two paragraphs in the first amended complaint, as well as the screenshot of his counsel's attempt to share the Article from the Website.  Harbus' Mem. at 15.  However, a close look at the first amended complaint reveals that it alleges no such use.  Indeed, the first amended complaint plainly alleges that the Manhattan Institute "infringed [Harbus'] copyright in the Photograph by reproducing and

publicly displaying the Photograph on the Website." Am. Compl. ¶ 15.  It is axiomatic that a plaintiff may not amend a complaint by making new allegations in an opposition to a motion to dismiss.  *See Hunter v. N.Y.C. Health & Hosps. Corp.*, No. 13 Civ. 2659 (SLT)(WP), 2015 WL 1527646 at *12 (E.D.N.Y. March 31, 2015) (collecting cases).  In addition, the screenshot cited to only shows Harbus' counsel's attempt to share the Article on his own Facebook page using the share function on the Manhattan Institute's website.  As such, the Court declines to consider Harbus' allegation of the supposed use of the entirety of the Photograph on the Manhattan Institute's Facebook page for purposes of the instant motion.

In any event, this factor "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *See Fitzgerald*, 491 F. Supp. 2d at 188; *see also Katz v. Chevalding*, No. 12 Civ. 22211, 2014 WL 2815496, at *8 (S.D. Fla. June 17, 2014), *adopted by*, 2014 WL 4385690 (S.D. Fla. Sept. 5, 2014).  Here, given the purpose of the Manhattan Institute's use of the Photograph, it would have been arguably reasonable for it to display the entirety of the Photograph in order to educate the public about its work and document its publication.  *See Bill Graham Archives*, 448 F.3d at 613 (adopting the reasoning that wholesale copying of a copyrighted image is "sometimes necessary to make a fair use of the image").

### D.  Factor Four:  The Effect of the Use Upon the Market for or Value of the Original

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  In *Harper & Row*, the Supreme Court described this factor as "undoubtedly the single most important element of fair use."  471 U.S. at 566.  This factor "requires courts to consider not only the extent of market harm caused by the particular

16

actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[A][4] 91993)).  The Second Circuit has "made clear that '[the court's] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.'"  *Cariou*, 714 F.3d at 708 (quoting *Blanch*, 467 F.3d at 258)).  "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop."  *Campbell*, 510 U.S. at 592.  In conducting this analysis, courts are "mindful that '[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original,' even though 'the fair use, being transformative, might well harm, or even destroy, the market for the original.'"  *Cariou*, 714 F.3d at 709 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 131, 145 (2d Cir. 1998)).

Furthermore, "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994) (internal citations omitted).  As the Second Circuit has noted, however, "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder."  *Id.* at 930 n.17; *see also Bill Graham Archives*, 448 F.3d at 614.

Here, the Court concludes that the last factor tips in favor of a finding of fair use as well.

As a threshold matter, Harbus is not entitled to a presumption of market harm.  As the Supreme

Court instructed in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984),

while some probability of market harm may be presumed for an unauthorized commercial use of

the copyrighted material, there is no such presumption when the use is for a "noncommercial

purpose."  The Supreme Court further clarified that instruction in *Campbell*:

> "*Sony's* discussion of a presumption contrasts a context of verbatim copying of
> the original in its entirety for commercial purposes, with the noncommercial
> context of *Sony* itself (home coyping of television programming).  In the former
> circumstances, what *Sony* said simply makes common sense:  when a commercial
> use amounts to mere duplication of the entirety of an original, it clearly
> "supersede[s] the objects," of the original and serves as a market replacement for
> it, making it likely that cognizable market harm to the original will occur.  But
> when, on the contrary, the second use is transformative, market substitution is at
> least less certain, and market harm may not be so readily inferred."

510 U.S. at 591 (internal citations omitted).  Therefore, because the Manhattan Institute's

use of the Photograph is transformative and noncommercial, there is no presumption of market

harm here.

Furthermore, the Manhattan Institute's use of the Photograph does not supplant or usurp

the market for licensing the Photograph.  Here, Harbus acknowledges that he licenses his

photographs to online and print media for a fee.  Am. Compl. ¶ 5.  The Manhattan Institute,

however, is not a media company, nor did it use the Photograph to illustrate any independent

news story.  Also weighing in defendant's favor is the manner in which the Photograph was

displayed on the Website, on which neither Governor Cuomo's face nor the Tappan Zee bridges

are even visible.  Even drawing all reasonable inferences in Harbus' favor at this stage, it is

implausible that potential buyers would opt to license the significantly cropped and darkened

version of the Photograph, further obscured by overlaid text as displayed on the Website, rather

than the original Photograph.  Accordingly, the secondary use of the Photograph could not be

seen as a "significant competing substitute" because it does not compete against the original in any way in its market—licensing to online or print media outlets. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015); *see also Yang*, 405 F. Supp. 3d at 548 (similarly concluding on a motion to dismiss that it was implausible that potential purchasers would opt to use a cropped and composite version of the photograph rather than license the original one).[6]

### E.  Overall Assessment

In light of the above factors, even drawing all reasonable inferences in Harbus' favor, it is evident that the Manhattan Institute's use of the Photograph was fair.  The use was transformative and noncommercial, and reasonable in light of that end.  The Photograph is a factual work that has already been published, and there is no plausible risk to any market for licensing of the Photograph.  This is sufficient to make out an affirmative defense of fair use at the motion to dismiss stage.  For the foregoing reasons, the Manhattan Institute's motion to dismiss is granted on the basis that its use of the Photograph was fair as a matter of law.

---

[6] Harbus' concern that a finding of fair use here would give nonprofit organizations a "blanket license to expropriate whatever content it pleases" is unfounded.  Harbus' Mem. at 2.  As Harbus acknowledges, the 1976 Copyright Act, like the fair use doctrine it recognizes, "calls for case–by–case analysis."  *Campbell*, 510 U.S. at 577; Harbus' Mem. at 5.  Here, this case concerns only the Manhattan Institute's limited use of a darkened and severely cropped version of the Photograph to educate the public about its work, namely the Article, and to document its publication in the New York Post.

## IV.    CONCLUSION

For the reasons set forth above, the Manhattan Institute's motion to dismiss is

GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 19, and

close the case.

SO ORDERED.

Dated:    April 27, 2020
          New York, New York

_____
Edgardo Ramos, U.S.D.J.